Nos. 04-97-00348-CR and 04-97-00349-CR



Clinton Vernon WILLIAMS,


Appellant



v.



The STATE of Texas,


Appellee



From the 290th Judicial District Court, Bexar County, Texas


Trial Court Nos. 95-CR-1601 and 95-CR-1602


Honorable Sharon MacRae, Judge Presiding(1)



Opinion by: Tom Rickhoff, Justice 


Sitting: Tom Rickhoff, Justice

 Catherine Stone, Justice

 Paul W. Green, Justice


Delivered and Filed: January 20, 1999


AFFIRMED


 Clinton Vernon Williams was convicted of murder and attempted murder after gunfire
erupted at a San Antonio intersection. He was sentenced to 75 years on the murder charge and 60
years on the attempted murder charge; the jury made a deadly weapon finding in each case, and also
found that Williams was a habitual offender. In four points of error common to both cases,
Williams contends he was denied a fair trial because he was not afforded an adequate opportunity
to confront a prosecution witness. In two points of error germane only to his murder conviction,
Williams challenges the sufficiency of the evidence to sustain the identification of the victim. We
affirm.

Facts


 On October 17, 1994, a car containing Chad Davis, Theron Smith and Quentin Henry pulled
up behind a Suburban with tinted windows at the intersection of Acme Road and Commerce Street
in San Antonio. Smith testified at trial that he saw Williams get out of the front passenger side of
the Suburban and start shooting with what appeared to be an SKS assault rifle. (Smith said he knew
Williams; apparently they were related.) Smith said he was hit four times by bullets and flying glass.
Smith said Chad Davis, the driver, backed up the car and parked it in a store parking lot near the
intersection; he said he did not realize Davis had been hit at the time. Meanwhile, bystanders drove
him from the parking lot to his mother's house in another car. After learning Davis had been hit,
Smith said, he returned to the scene and saw that Davis was unconscious and bleeding. An
ambulance was summoned, but Davis later died of his wounds. Smith said he had never been
convicted of a felony.

 Quentin Henry testified that he was riding in the back seat of a car with Davis and Smith
when they stopped for a traffic light at the corner of Acme Road and West Commerce Street. When
Henry looked out the front, he said he saw Williams in front of a Suburban with tinted windows.
Henry said he looked away from Williams, and when he did, five shots rang out in quick succession;
at that point Henry said Smith pushed his head down in the back seat. Henry said he heard "more
than 10" shots in quick succession; when he looked up, the Suburban and Williams were gone.
Henry said Davis managed to park the car at a store and he left to tell Smith's grandmother what had
happened. At the time, Henry said, he did not realize Davis had been hit. When Davis didn't show
up at the house, Henry said, he went back to the parking lot and found Davis bleeding and unable
to talk.

 On direct examination Henry admitted his parole on burglary of a motor vehicle charges had
recently been revoked and that he was waiting to be sent back to the penitentiary.

 Both Henry and Smith testified that they were unarmed and that there were no guns in their
car at the time of the shooting.

 Dr. Vincent DeMaio, Bexar County medical examiner, testified that he had performed an
autopsy on an individual identified as Chad Davis. He said Davis bled to death from a bullet wound
to the chest.

 Richard Stengel, a firearm and tool mark examiner with the Bexar County Forensic Science
Center, testified he had examined the remains of the bullet that killed Chad Davis. He said the bullet
could only have been fired from an AK-47 or SKS assault rifle.

 Williams' complaints center around the testimony of Gwendolyn Keeter,(2) Smith's mother.
Keeter testified that Williams called her on the phone the day after the shooting and stated that "he
did not mean to shoot [her] son, but he meant to kill Chad Davis." Keeter also testified that
Williams called her several times a day for several days after the shooting, seeking to relay messages
to her son through her.

 Keeter was not on the prosecution's witness list. Prosecutors said they interviewed her two
days before trial and informed defense attorneys of their intent to call her the day before trial. Keeter
testified on cross-examination that she told Detective Barry Gresham of the San Antonio Police
Department about Williams' phone call two days later, but that the detective was not interested in
her story and did not take her statement. She said she called the district attorney's office just days
before trial and told them what Williams told her. Williams sought a continuance based on this
testimony, which was granted in part; the trial was postponed for two days while defense attorneys
attempted to contact Gresham. (They were unsuccessful.) The defense was able to call James
Caruso, a civilian police service agent assigned to the homicide unit. Caruso testified he had gone
through Detective Gresham's case file and found no note or report on a conversation between
Gresham and Keeter. Caruso also testified that he had no personal knowledge of a phone call from
Keeter to Gresham in which Keeter might have disclosed the alleged admission.

 Stephanie McHenry testified that the reputations in the community of Henry and Smith for
telling the truth and veracity were bad.

 The jury convicted Williams in the murder of Davis and the attempted murder of Smith.

 The defense moved for a new trial based on surprise. Williams asserts that Keeter testified
for the first time at trial that she told the detective about her conversations with Williams two days
after the shooting. Williams argues that because of this surprise, he was unable to call the detective
to impeach Keeter's testimony. (At the time of trial, Gresham was on vacation in Hawaii). At a
motion for new trial, Gresham testified he talked to Keeter "a couple of times on the phone" but that
she never told him of any admission by Williams.

 Another matter at issue at the motion for new trial hearing was Keeter's criminal record.
Defense attorneys introduced Keeter's conviction for welfare fraud and subsequent ten-year
probation and complained that the prosecution's conduct did not afford them the opportunity to
impeach Keeter's testimony at trial with her conviction. The prosecutor who handled Keeter at trial
testified that she ordered a cursory computer search for any police record on Keeter which turned
up nothing.(3) She said Keeter did tell her "a long time ago [she] had some kind of welfare thing but
she had paid it off and it was not a conviction." Based on this, the computer search, and the office's
policy of granting deferred adjudication for welfare fraud, the prosecutor said she assumed Keeter's
record was clean. In fact, Keeter had pled guilty to welfare fraud in 1994 and was on probation
through 2004.

Surprise Witness


 Williams' complaints center on his inability, due to Keeton's last-minute appearance on the
prosecution's witness list, to impeach her testimony.

 1. Continuance

 Williams first contends the trial court abused its discretion in not granting a continuance and
that this failure to grant a continuance abridged his Sixth Amendment right to confront Keeter. The
State argues that because the continuance was sought for the purposes of seeking impeachment
testimony, the trial court did not abuse its discretion.

 A defendant is entitled to a continuance during trial if an unexpected occurrence, which no
reasonable diligence could have anticipated, causes him to be "so taken by surprise that a fair trial
cannot be had." Tex. Code Crim. Proc. Ann. art. 29.13 (Vernon 1989). We review the trial court's
action under an abuse of discretion standard. Barney v. State, 698 S.W.2d 114, 127 (Tex. Crim.
App. 1985).

 "It is fundamental that when a witness in a criminal case testifies about a specific fact or
event, and that fact or event is more than a very minor detail of his testimony, then the opposing side
may present evidence to rebut the testimony. Such impeachment goes directly to the credibility of
the witness, a factor that in many cases may critically affect the outcome of the prosecution."
Montemayor v. State, 543 S.W.2d 93, 94 (Tex. Crim. App. 1976), overruled on other grounds by
Bates v. State, 587 S.W.2d 121, 143 (Tex. Crim. App. 1979).

 In general, the trial court has discretion as to the extent of cross-examination of a witness for
credibility or bias, and this decision is not subject to reversal on appeal absent a clear abuse of
discretion. Cantu v. State, 939 S.W.2d 627, 635 (Tex. Crim. App.), cert. denied, 118 S.Ct. 557
(1997); Chambers v. State, 866 S.W.2d 9, 27 (Tex. Crim. App. 1993), cert. denied, 511 U.S. 1100
(1994). It is not an abuse of discretion for a trial court to deny a motion for continuance when the
continuance is sought to obtain impeachment testimony. Keel v. State, 434 S.W.2d 687, 689 (Tex.
Crim. App. 1968); Herring v. State, 758 S.W.2d 849, 854 (Tex. App.--Corpus Christi 1988), cert.
denied, 493 U.S. 896 (1989). And when a witness is cross-examined on a collateral matter, the
cross-examining party cannot then contradict the witness. Bates, 587 S.W.2d at 133.

 Here it is undisputed that the purpose for the continuance was to secure the attendance of
Detective Gresham, who was to testify as to whether Keeter had called him three days after the
shooting and relayed news of the telephone call from Williams, as she had testified. In other words,
the only reason for Gresham to testify would be to impeach Keeter's testimony, not on the central
matter of whether the admission was made to her, but on the collateral matter of who Keeter told
about the admission. We therefore find that the trial court did not abuse its discretion in denying the
motion for continuance. Williams' first and second points of error are overruled.

Prior Conviction


 In his third and fourth points of error Williams contends he was denied a fair trial because
the prosecution did not reveal Keeter's conviction for welfare fraud.

 Under Brady v. Maryland, 373 U.S. 83 (1963), a prosecutor has an affirmative duty to turn
over to the defense material, exculpatory evidence. Similarly, under state law a defendant is entitled
to a new trial where material evidence favorable to the accused has been discovered since trial. Tex.
Code Crim. Proc. Ann. art. 40.001 (Vernon Supp. 1998). Impeachment evidence is included within
the scope of the term "exculpatory evidence." U.S. v. Bagley, 473 U.S. 667, 676 (1985). Evidence
withheld by a prosecutor is "material" if there is a reasonable probability that, had the evidence been
disclosed to the defense, the outcome of the proceeding would have been different. Id. at 682. A
"reasonable probability" is a probability sufficient to undermine confidence in the outcome of the
trial. Id. Thus, a due process violation has occurred if a prosecutor: (1) fails to disclose evidence,
(2) favorable to the accused, (3) which creates a probability of a different outcome. Id.; Thomas v.
State, 841 S.W.2d 399, 404 (Tex. Crim. App.1992). We view the evidence in the aggregate, not in
isolation, for determining whether the materiality requirement of a Brady violation has been
established. Kyles v. Whitley, 115 S.Ct. 1555, 1567 (1995). Our inquiry, therefore, will turn on
whether the fact that Keeter was on probation at the time of her arrest was material.

 The Bagley analysis is not a sufficiency analysis. Id. at 1566. Our consideration is limited
to whether effective impeachment of Keeter by Williams' attorneys, using her prior felony
conviction, would be "sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682
(quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)). We find that it did not. Even without
Keeter's testimony, prosecutors could still rely on two eyewitnesses who both knew Williams prior
to the shooting and who identified Williams as the man who did the shooting. Cf. Bagley, 473 U.S.
at 685-686 (Marshall, J., dissenting) (arguing that when impeachment evidence in question
undermined the only testimony supporting a conviction, withholding of that evidence could not be
harmless as a matter of law). We find the prosecution's behavior on this point disturbing; however,
our confidence in the outcome of this trial is not sufficiently undermined to warrant reversal.
Williams' third and fourth points are overruled.

Sufficiency of Identification


 In his fifth and sixth points of error Williams challenges the sufficiency of the evidence to
support the identification of the victim of his shooting as Davis. The indictment charged Williams
with intentionally and knowingly causing the death of Chad Davis by shooting him with a firearm.
Williams contends that the State failed to prove that Chad Davis was the victim on whom the
autopsy was performed, and that the evidence is therefore legally and factually insufficient to support
his conviction. We disagree.

 Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction. See Jackson v. Virginia, 443 U.S. 307,
315-16 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson,
443 U.S. at 320, 99 S.Ct. at 2789; Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993),
cert. denied, 511 U.S. 1046 (1994). The evidence is examined in the light most favorable to the
jury's verdict. Jackson, 443 U.S. at 320; Johnson, 871 S.W.2d at 186. The sufficiency of the
evidence is measured against the offense defined by a hypothetically correct jury charge. Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that
"accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the
State's burden of proof or unnecessarily restricts the State's theories of liability, and adequately
describes the particular offense for which the defendant is tried." Id.

 The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and
the weight to be given to their testimony. See Tex. Code Crim. Proc. Ann. Art. 38.04 (Vernon
1979); Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. [panel op.] 1981). It is for the
jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. Bowden v. State, 628
S.W.2d 782, 784 (Tex. Crim. App. 1982). Even where there is no conflict, the jury may give no
weight to some evidence, and thereby reject part or all of a witness's testimony. See Beardsley v.
State, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987); see also Chambers, 805 S.W.2d at 461 (holding
jury as judge of credibility may "believe all, some, or none of the testimony"). Because it is the
province of the jury to determine the facts, any inconsistencies in the testimony should be resolved
in favor of the jury's verdict in a legal sufficiency review. Johnson v. State, 815 S.W.2d 707, 712
(Tex. Crim. App. 1991) (quoting Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim App. 1988)).

 Under a factual sufficiency review, the reviewing court considers all the evidence without
the prism of "in the light most favorable to the verdict" and determines whether the jury's verdict
is contrary to the overwhelming weight of the evidence and therefore clearly wrong and unjust. See
Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996). We must be deferential to the fact finder,
i.e., careful not to invade the province of the jury to assess the credibility and weight of the
evidence. Id. at 133, 135; De Los Santos v. State, 918 S.W.2d 565, 569 (Tex. App.--San Antonio
1996, no pet.).

 Here there is abundant evidence from which a rational jury could have inferred that the body
in question was that of Chad Davis. In evidence were photographs of Davis before his death and an
autopsy photograph of Davis after his death. Both Smith and Henry testified they saw Davis shot
and bleeding profusely after the attack. Dr. DeMaio testified that he identified the body in the
autopsy photograph as Davis from the unique number assigned to each case. The time of death for
the body was consistent with that of Davis. Keeter testified that Williams told her on the telephone
that he meant to shoot Davis, implicitly identifying the victim of the attack. And Williams' counsel
never leveled an objection to the lack of identification. Although no witness testified from personal
knowledge that the person they knew as Chad Davis was the person in the autopsy photograph, such
proof was not required. See Johnson v. State, 83 Tex. Crim. 376, 203 S.W. 903, 904 (1918). We
find that the evidence was both legally and factually sufficient to prove Davis's death. Williams'
fifth and sixth points of error are overruled, and the judgment of the trial court is affirmed.


 Tom Rickhoff, Justice 

Do Not Publish

1. The Honorable William Bachus presided at trial.
2. The discrepancy discussed later on Keeter's criminal record centers on the spelling of her first name. Here
we use the spelling attested to under oath by the prosecutor who handled Keeter at the Motion for New Trial hearing.
3. The prosecutor attributed the discrepancy to the different ways of spelling Keeter's
 first name.


Return to
4th Court of Appeals Opinions